MICHAEL G. KING (SBN 145477)
JENNIFER M. MILLIER (SBN 253814)
**HENNELLY & GROSSFELD LLP**
4640 Admiralty Way, Suite 850
Marina del Rey, CA 90292
Tel: 310-305-2100
Fax: 310-305-2116
EM: mking@hgla.com
EM: jmillier@hgla.com

Attorneys for plaintiffs
WHOLE BODY RESEARCH, LLC; PROBIOTIC AMERICA, LLC; PACIFIC HEALTH SUPPLEMENTS, LLC (d/b/a NUCIFIC); DSMB PARTNERS, LLC (d/b/a ACTIVATED YOU); AGOURA HEALTH PRODUCTS, LLC (d/b/a GUNDRY MD, LLC); and PRINCETON NUTRIENTS, LLC

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

WHOLE BODY RESEARCH, LLC, a California limited liability company; PROBIOTIC AMERICA, LLC, a California limited liability company; PACIFIC HEALTH SUPPLEMENTS, LLC (d/b/a NUCIFIC), a California limited liability company; DSMB PARTNERS, LLC (d/b/a ACTIVATED YOU), a California limited liability company; AGOURA HEALTH PRODUCTS, LLC (d/b/a GUNDRY MD, LLC), a California limited liability company; and PRINCETON NUTRIENTS, LLC, a California limited liability company,

Plaintiffs,

v.

DIGEST MD, LLC, a Wyoming limited liability company; UNITED PROBIOTICS, LLC, a Delaware limited liability company; SUNAINA KODURU, an individual; SUTHA SACHAR, an individual; ALAN KOFMAN, an individual; CHRISTIAN EDMONDS, an individual; and DOES 1-10,

Defendants.

**CASE NO.**

Assigned to:

**PLAINTIFFS' COMPLAINT FOR:**

**(1) COPYRIGHT INFRINGEMENT**
**(2) CONTRIBUTORY COPYRIGHT INFRINGEMENT**
**(3) TRADE DRESS INFRINGEMENT**
**(4) BREACH OF CONTRACT**
**(5) VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**

**INJUNCTIVE RELIEF REQUESTED**

**DEMAND FOR JURY TRIAL**

Action filed on:

Plaintiffs, by way of complaint against Defendants, allege as follows:

## SUMMARY OF CLAIMS

1.     Plaintiffs are six related limited liability companies in the business of creating, marketing and selling health, wellness and beauty brands and products online.  Plaintiffs spend hundreds of thousands of dollars developing, testing and fine-tuning their online advertisements and websites to generate business through direct response marketing and attract consumers to their websites.

2.     Plaintiffs seek injunctive relief and damages here because Defendants copied – and lifted the copyrighted content of – Plaintiffs' websites.  Not only did Defendants steal the "look and feel" of Plaintiffs' websites, Defendants are using published content and ads virtually identical to those that Plaintiffs' former employees, Defendants Kofman and Edmonds, developed, tested and marketed while working for Plaintiffs.  Kofman and Edmonds knew exactly which products sold best, which ads tested well and had the most click-through conversions into buying customers and which websites captured customers' attention due to their years of working at, and acquiring the confidential information of, Plaintiffs. Kofman and Edmonds are believed to have created Defendants Digest MD, LLC and United Probiotics, LLC, with the help of Dr. Koduru and Dr. Sachar, and copied (in some instances, word for word and feature for feature), Plaintiffs' websites, ads and video content.  On this basis, Plaintiffs claim copyright and trade dress infringement, contributory copyright infringement, breach of Defendants Kofman and Edmonds' confidentiality agreements and violations of the Computer Fraud & Abuse Act.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to the Federal Copyright Act, 17 U.S.C. § 501; and/or 28 U.S.C. § 1331.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1); 28 U.S.C. § 1391(b)(2); and/or 28 U.S.C. § 1391(b)(3).

///

## PLAINTIFFS

5.   Plaintiff Whole Body Research, LLC ("Whole Body Research") is a limited liability company duly organized under the laws of the state of California with a principal place of business in Los Angeles, California.

6.   Plaintiff Probiotic America, LLC ("Probiotic America") is a limited liability company duly organized under the laws of the state of California with a principal place of business in Woodland Hills, California.

7.   Plaintiff Pacific Health Supplements, LLC (d/b/a Nucific) ("Nucific") is a limited liability company duly organized under the laws of the state of California with a principal place of business in Woodland Hills, California.

8.   Plaintiff DSMB Partners, LLC (d/b/a Activated You) ("Activated You") is a limited liability company duly organized under the laws of the state of California with a principal place of business in Woodland Hills, California.

9.   Plaintiff Agoura Health Products, LLC (d/b/a Gundry MD, LLC) ("Gundry MD") is a limited liability company duly organized under the laws of the state of California with a principal place of business in Woodland Hills, California.

10.   Plaintiff Princeton Nutrients, LLC ("Princeton Nutrients") is a limited liability company duly organized under the laws of the state of California with a principal place of business in Woodland Hills, California.

11.   Collectively, plaintiffs Whole Body Research, Probiotic America, Nucific, Activated You, Gundry MD and Princeton Nutrients are referred to herein as "Plaintiffs."

## DEFENDANTS

12.   Plaintiffs are informed and believes, and on that basis alleges, that defendant Digest MD, LLC ("Digest MD") is a limited liability company organized under the laws of the state of Wyoming with its principal place of business in Sheridan, Wyoming.

13.   Plaintiffs are informed and believes, and on that basis alleges, that

defendant United Probiotics, LLC ("United Probiotics") is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Lewes, Delaware.

14.    Plaintiffs are informed and believes, and on that basis alleges, that defendant Dr. Sunaina ("Nina") Koduru ("Dr. Koduru") is an individual residing in New York, New York.

15.    Plaintiffs are informed and believes, and on that basis alleges, that defendant Dr. Sutha ("Su") Sachar ("Dr. Sachar") is an individual residing in Los Angeles County, California.

16.    Plaintiffs are informed and believes, and on that basis alleges, that defendant Alan Kofman ("Kofman") is an individual residing in Los Angeles County, California.

17.    Plaintiffs are informed and believes, and on that basis alleges, that defendant Christian Edmonds ("Edmonds") is an individual residing in Los Angeles County, California.

18.    Collectively, defendants Digest MD, United Probiotics, Dr. Koduru, Dr. Sachar, Kofman and Edmonds are referred to herein as "Defendants."

19.    The true names and capacities, whether individual, corporate or otherwise, of Does 1 through 10, inclusive, are presently unknown to Plaintiffs and for that reason those defendants are sued by such fictitious names pursuant to Local Rule 19-1.  Since discovering the facts giving rise to this action, Plaintiffs have diligently investigated who could be responsible for their damages.  Despite their best efforts, Plaintiffs believe that there are additional defendants who could in some way be responsible for their damages.  On this basis, Plaintiffs allege that the defendants designated herein as a Doe are in some way responsible for the damages alleged in this complaint.  Plaintiffs will seek leave to amend this complaint pursuant to Federal Rule of Civil Procedure Rule 15(a)(2) and Rule 21 to allege the true names and capacities of said defendants when the same have been ascertained.

20. Plaintiffs are informed and believe, and on that ground allege, that at all times mentioned herein each of the Defendants was the agent and/or employee of each of the remaining Defendants, acting within the purpose, course and scope of that agency and/or employment, with the express and/or implied knowledge and/or consent of the other Defendants; that the acts and omissions of each Defendant alleged herein were authorized and/or ratified by the other Defendants; and/or that Defendants are co-conspirators and conspired with each of the other Defendants to engage in the acts and omissions alleged herein.

## STATEMENT OF FACTS

### I. PLAINTIFFS' BUSINESS DEPENDS ON INTERNET MARKETING.

21. Plaintiffs are in the business of creating, marketing and selling health, wellness and beauty brands featuring innovative, high quality products endorsed by nationally recognized doctors. Each Plaintiff focuses on bringing different sustainable health and wellness products to people all over the world. While each plaintiff is its own limited liability company, all were started and are currently owned by the same individuals.

22. Plaintiffs spend hundreds of thousands of dollars developing, testing and fine-tuning their online advertisements and websites to generate business through direct response marketing. Direct response marketing elicits from a consumer a specific, direct response to a marketer. It allows marketers to understand the performance of their products nearly instantaneously, e.g. consumers clicking a website's ad and engaging in response to it. Delivery, tracking and analytics are used to measure the results of a direct response marketing campaign.

23. Here, Plaintiffs have a unique direct response marketing model that depends heavily on the development and placement of website ads that engage consumers, getting consumers to click through an ad, view more information about Plaintiffs' product (e.g. text, audio and/or video) and ultimately, purchase a product from one of Plaintiffs' websites. For just one health supplement product, a Plaintiff

will easily spend over one hundred thousand dollars in developing website advertisements and purchasing ad space on websites in order to launch a new product.

24.    Many products and ad campaigns do not succeed; it is a lengthy process of trial and error to develop, test and hone the websites and banner ads to see what colors, images and features work with consumers.  The process of developing a product's website and the advertisements that will be placed on other websites (to get a consumer to click through) can take months to complete.  When Plaintiffs do have successful products, it is only after a significant investment of employee time and consumer testing.  For example, the research and development of Nucific's BioX4 health supplement product, website and advertising cost in the millions. Knowing which specific products, websites and banner ads do well is highly valuable information to Plaintiffs and is kept confidential and not disclosed to the public or competitors.

25.    The businesses Plaintiffs have spent years, millions of dollars, and countless hours developing would be seriously harmed if a competitor improperly accessed and used its confidential product, website and ad information.  If a competitor used Plaintiffs' confidential information, it could unfairly devastate Plaintiffs' business – e.g., develop products similar to Plaintiffs' best sellers; use the colors, features and content of Plaintiffs' highest grossing websites and highest click-through ads; and alter its product development and advertising to unfairly take away Plaintiffs' customers and market share.

26.    To prevent this, Plaintiffs restrict access to their confidential information, including the relative success of each product, website and ad; employees are required to agree to treat such information as confidential by signing confidentiality agreements as a condition of employment.  Upon their departure, employees are required to give back any confidential information in their possession, including any of their work product developed while working for Plaintiffs.  Further,

even those employees with access are only granted access to that portion of the information that they "need to know."

## II. PLAINTIFFS HIRE KOFMAN AND EDMONDS TO WORK ON MARKETING PLAINTIFF NUCIFIC'S BIOX4 SUPPLEMENT.

27. Plaintiff Whole Body Research hired Defendants Kofman and Edmonds to develop and market Nucific's BioX4 product. Defendant Edmonds was hired in March 2014 to be the brand manager for BioX4 and Defendant Kofman was hired in January 2015 as a media buyer for BioX4. These two worked together on BioX4 during their time working for Plaintiffs. While they were hired by Plaintiff Whole Body Research, Defendants Kofman and Edmonds performed work for Plaintiff Nucific and had access to the confidential, proprietary and valuable information of all Plaintiffs, which are all based in the same building and owned by the same individuals.

28. As part of their hiring, Defendants Kofman and Edmonds executed confidentiality and non-disclosure agreements (hereinafter the "Confidentiality Agreements"), agreeing to keep certain company information confidential both during and after their employment with Plaintiffs. True and correct copies of Defendants Kofman and Edmonds' signed Confidentiality Agreements are attached hereto as Exhibits 1 and 2, respectively, and incorporated by reference. Their signing of the Confidentiality Agreements was a condition of their employment. Employees were also required to keep confidential all confidential or proprietary information Plaintiffs received from any third party.

29. The first paragraph of both Confidentiality Agreement define "Confidential Information" as:

> … any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans. products, formulas, services, customer lists and customers (including, but not limited to, customers of the Company on whom Employee has called

> or with whom he or she became acquainted during the term of Employee's employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to Employee by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment.

*See* Defendant Edmonds and Kofman's Confidentiality Agreements at paragraphs 1(a), attached hereto as Exhibits 1 and 2. In each of their Confidentiality Agreements, Edmonds and Kofman agreed that:

(a) Plaintiffs had "Confidential Information" as defined in the Confidentiality Agreement;

(b) They would not disclose Plaintiffs' "Confidential Information" to anyone outside of Plaintiffs or use it for any other purpose;

(c) They had an obligation not to disclose any confidential information received from third parties during the course of their employment;

(d) They had a continuing obligation not to disclose "Confidential Information" after their employment ended;

(e) They would return all "Confidential Information" at the end of their employment; and

(f) Any work developed, improved upon or contributed to by Edmonds and Kofman in connection with their employment (including copyrighted material, graphics and audiovisual materials) is the property of Plaintiffs.

*See* Defendant Edmonds and Kofman's Confidentiality Agreements at paragraphs 1(a), 1(c) and 2, attached hereto as Exhibits 1 and 2.

## III. THE COPYRIGHTED MATERIAL

30. In addition to Confidential Information, the below-identified Plaintiffs

have copyrights (or copyright applications pending with the United States Copyright Office) for the following material, posted on Plaintiffs' websites and used in the online advertising of Plaintiffs' products:

    a. Plaintiff Nucific's BioX4 Animation Script, published on August 7, 2017. Copyright application service record number 1-6288418371. This script was created by Nucific and is used by Nucific in the sale of its BioX4 product.

    b. Plaintiff Probiotic America's Perfect Biotics Script, published on March 11, 2016. Copyright application service record number 1-6288418397. This script was created by Probiotic America and is used by Probiotic America in the sale of its Perfect Biotics product.

    c. Plaintiff Gundry MD's Vital Reds Energy Sales Letter, published on May 19, 2017. Copyright application service record number 1-6252268891. This sales letter was created by Gundry MD and is used by Gundry MD in the sale of its Vital Reds Energy product.

## IV. KOFMAN AND EDMONDS DEPART WITH THEIR COMPUTERS' CONTENT AND WIPE AWAY ANY TRACE OF THEIR THEFT.

31. In February 2016, Plaintiffs decided to let Defendant Kofman go due to absenteeism. Two days later, Defendant Edmonds gave notice.

32. Shortly after their departure, Plaintiffs discovered that the two computers used exclusively by Defendants Kofman and Edmonds were completely wiped – all content was intentionally erased from their computers, including the operating systems. There is no reason for Defendants to have done this, except to conceal the taking of Plaintiffs' Confidential Information.

33. All of the information on Plaintiff Nucific's BioX4 product and years of work stored on these computers was lost; Plaintiffs had no central or cloud server that backed up this information and it was not otherwise stored. Plaintiffs even took these two computers to a computer repair store, attempting to recover everything

that was lost, but the repair store was unable to recover or restore any data.

34.   Plaintiffs asked Defendants Kofman and Edmonds to return this information and pay for re-installing the operating systems, however Defendants Kofman and Edmonds never responded to Plaintiffs' request.

## V.   PLAINTIFFS DISCOVER DEFENDANTS' COMPETING PRODUCTS WITH NEAR IDENTICAL WEBSITES, VIDEO AND AD CONTENT.

35.   In or around late 2017, Plaintiffs discovered the nearly identical websites, ads and video content of Defendants Digest MD and United Probiotics.

### A.   THE COPIED WEBSITES

36.   Plaintiff Activated You's order page was copied by Defendant Digest MD nearly word for word and feature for feature, as reflected in the attached Exhibits 3A and 3B, incorporated here by reference.  Defendant Digest MD even copied the page source code for Plaintiff Activated You's website, as reflected in the attached Exhibit 4 and incorporated here by reference.  The green highlighted portions of the attached Exhibit 4, "Added by HTTrack," reflects that the code was duplicated via an online "website copier" tool called HTTrack (www.httrack.com). The orange highlight reflects that the main styling file was copied and re-uploaded onto Defendant Digest MD's servers.  The yellow highlight shows matches of other page styling as well as page structure.  The only differences in Defendant Digest MD's website code are slight changes to color and branding to replace Plaintiff Activated You's logos and contact information with Defendant Digest MD's logo and information.

37.   Defendant Digest MD also copied a "Select a Package to Begin" page from one of Plaintiffs' other brands, Princeton Nutrients, as reflected in the attached Exhibits 5A and 5B, incorporated here by reference.

38.   Defendant United Probiotics copied Plaintiff Gundry MD, LLC's order page completely, as reflected in the attached Exhibits 6A and 6B, incorporated here by reference.

**B. THE IDENTICAL BANNER**

39. While working for Plaintiffs, Defendant Edmonds had developed a banner ad with written copy that was hugely successful, leading to the sale of millions of dollars' worth of Plaintiff Nucific's product, BioX4. A copy of Nucific's BioX4 banner ad is attached hereto as Exhibit 7A and incorporated by reference. The very same banner ad now appears to be used by both Defendants Digest MD and United Probiotic, with nearly identical written copy. A copy of Defendants' banner ad is attached as Exhibit 7B hereto and incorporated by reference.

40. Plaintiffs are informed and believe that Defendants are spending tens of thousands of dollars to promote their websites by purchasing ad space for these banners, directly competing against Plaintiffs' products and cutting into Plaintiffs' market share by using the Confidential Information Kofman and Edmonds had access to and developed while working for Plaintiffs.

**C. THE COPYRIGHTED SCRIPTS**

41. Finally, Plaintiffs discovered that Defendants had lifted the copyrighted content of Plaintiffs Nucific, Probiotic America and Gundry MD, as follows:

a. Content from both Plaintiff Probiotic America's Perfect Biotics Script and Plaintiff Nucific's BioX4 Animation Script appear in Defendant Digest MD's "Five Harmful Foods" video.

b. Content from both Plaintiff Probiotic America's Perfect Biotics Script and Plaintiff Gundry MD's Vital Reds Energy Sales Letter appears in Defendant United Probiotic's "3 Horrible Foods" video.

42. Because of Plaintiffs' substantial investment of time and money in developing its successful websites, ads and copyrighted material, and because of the damage that Plaintiffs have suffered and the imminent damages they will suffer because of Defendants' conduct, Plaintiffs filed this complaint seeking damages and immediate injunctive relief.

/ / /

**FIRST CAUSE OF ACTION**

**COPYRIGHT INFRINGEMENT –**

**VIOLATION OF THE FEDERAL COPYRIGHT ACT**

17 U.S.C. §501, et seq.

(Plaintiffs Nucific, Probiotic America and Gundry MD Against All Defendants and Does 1-10)

43. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1–42 inclusive, as though fully set forth herein.

44. Plaintiffs Nucific, Probiotic America and Gundry MD's works identified in paragraph 30(a)–(c), above, are protected under the copyright laws of the United States.[1]

45. At all times relevant hereto, Plaintiffs Nucific, Probiotic America and Gundry MD have been and are currently the owners of the copyrights of the works identified in paragraph 30(a)–(c), above.

46. The copyrights of the above works have been registered with the United States Copyright Office, or are the subjects of pending applications for registration. Plaintiffs Nucific, Probiotic America and Gundry MD have applied for the appropriate certificate of registration and received a case numbers 1-6288418371 (Nucific), 1-6288418397 (Probiotic America) and 1-6252268891 (Gundry MD) from the Copyright Office.

47. Defendants have, without authority of the copyright owner, reproduced, prepared derivative works based on, publicly displayed and/or distributed copies of the copyrighted works of Plaintiffs Nucific, Probiotic America and Gundry MD, in

---

[1] Per Local Rule 19.2, inclusion of multiple copyright holders in this action is appropriate because the copyright holders are companies that are owned by the same individuals and the copyright holders have other claims, in addition to copyright infringement, asserted herein against Defendants. To prevent a multiplicity of actions and promote efficient use of judicial resources, the three copyright infringement claims are therefore asserted in this case. *See* accompanying Declaration of Jennifer M. Millier per Local Rule 19-2.

violation of Section 106 of the Copyright Act of 1976, 17 U.S.C. §106, and the exclusive rights of Plaintiffs Nucific, Probiotic America and Gundry MD.

48. Defendants' acts of infringement were willful, in disregard of, and in indifference to the rights of Plaintiffs Nucific, Probiotic America and Gundry MD.

49. As a direct and proximate result of Defendants' misconduct, Plaintiffs Nucific, Probiotic America and Gundry MD have sustained and will continue to sustain substantial, immediate and irreparable injury for which there is no adequate remedy at law. Unless enjoined and restrained by this Court, Defendants will continue to infringe on Plaintiffs Nucific, Probiotic America and Gundry MD's rights in their copyrighted works.

50. As a result, Plaintiffs Nucific, Probiotic America and Gundry MD are entitled to preliminary and permanent injunctive relief and actual and/or statutory damages against Defendants pursuant to 17 U.S.C. §§502 and 504, in a form and amounts to be determined at trial.

51. As a further result of Defendants' misconduct, Plaintiffs Nucific, Probiotic America and Gundry MD have been forced to incur attorney fees and costs to enforce its rights. Therefore, Plaintiffs Nucific, Probiotic America and Gundry MD are also entitled to recover its attorney's fees and costs pursuant to 17 U.S.C. §505.

## SECOND CAUSE OF ACTION

## CONTRIBUTORY COPYRIGHT INFRINGEMENT – VIOLATION OF THE FEDERAL COPYRIGHT ACT

17 U.S.C. §501, et seq.

(Plaintiffs Nucific, Probiotic America and Gundry MD Against Defendants Dr. Koduru, Dr. Sachar and Does 1-10)

52. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-51 inclusive, as though fully set forth herein.

53. Defendants Dr. Koduru, Dr. Sachar and Does 1-10 had knowledge of

the infringing acts of defendants Digest MD, United Probiotics, Kofman and Edmonds (as alleged herein) and materially contributed to and/or induced the infringement of the copyrighted works of Plaintiffs Nucific, Probiotic America and Gundry MD, in violation of Section 106 of the Copyright Act of 1976, 17 U.S.C. §106, and the exclusive rights of Plaintiffs Nucific, Probiotic America and Gundry MD.

54. Defendants' acts of infringement were willful, in disregard of, and in indifference to the rights of Plaintiffs Nucific, Probiotic America and Gundry MD.

55. As a direct and proximate result of Defendants' misconduct, Plaintiffs Nucific, Probiotic America and Gundry MD have sustained and will continue to sustain substantial, immediate and irreparable injury for which there is no adequate remedy at law. Unless enjoined and restrained by this Court, Defendants' will continue to infringe on Plaintiffs Nucific, Probiotic America and Gundry MD's rights in their copyrighted works.

56. As a result, Plaintiffs Nucific, Probiotic America and Gundry MD are entitled to preliminary and permanent injunctive relief and actual and/or statutory damages against Defendants pursuant to 17 U.S.C. §§502 and 504, in a form and amounts to be determined at trial.

57. As a further result of the Defendants' misconduct, Plaintiffs Nucific, Probiotic America and Gundry MD have been forced to incur attorney fees and costs to enforce their rights. Therefore, Plaintiffs Nucific, Probiotic America and Gundry MD are also entitled to recover its attorney's fees and costs pursuant to 17 U.S.C. §505.

**THIRD CAUSE OF ACTION**

**TRADE DRESS INFRINGEMENT**

**VIOLATION OF THE LANHAM ACT**

15 U.S.C. § 1125, et seq.

(Plaintiffs Activated You, Princeton Nutrients and Gundry MD

Against All Defendants and Does 1-10)

58.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-57 inclusive, as though fully set forth herein.

59.    Defendants have, without authority of Plaintiffs Activated You, Princeton Nutrients and Gundry MD reproduced, publicly displayed and/or published online a website copying the look and feel of each of these Plaintiffs' website, in violation of Section 1125 of the Lanham Act, 15 U.S.C. § 1125, et seq., and the exclusive rights of these Plaintiffs.

60.    Plaintiffs Activated You, Princeton Nutrients and Gundry MD each have distinctive websites with the following features:

    a.    Plaintiff Activated You's website (a page of which is attached hereto as Exhibit 3A and incorporated herein) constitutes its trade dress and consists of the following distinctive elements:

        i.    Formatting of logos, graphics, text boxes and text;

        ii.    Plain white background with logo in the top left corner of order page;

        iii.    Language and placement on order page of "My Special Internet Only Offer to First Time Customers…";

        iv.    Language and placement on order page of "Availability: IN STOCK" and green text color of "IN STOCK";

        v.    Language and placement on order page of "Ships to you the next business day.";

        vi.    Language and placement on order page of "CHOOSE YOUR PACKAGE" quantity selection white box and highlight of the "3 Bottles" option;

        vii.    Language and placement on order page of orange "Get Started" button, inside white text box;

viii.   Language and placement on order page of "Your Price" and green text color of "Your Price";

ix.    Language and placement on order page of "90-DAY MONEY BACK GUARANTEE" across an image of a seal;

x.    Language and placement on order page of guarantee language, "Every order from ActivatedYou is backed by our 100% money back satisfaction guarantee. Try it for up to 90 days and if you aren't thrilled with the results, just send back the empty bottles for a full refund.";

xi.    Text appearing at the bottom of the order page, including the "Frequently Asked Questions" and "Ready to try ActivatedYou for Yourself?";

xii.   The overall theme and structure of the order page;

xiii.  Style, aesthetic, look and feel of order page; and

xiv.   The particularized combination of all of these elements.

b. Plaintiff Princeton Nutrient's website (a page of which is attached hereto as Exhibit 5A and incorporated herein) constitutes its trade dress and consists of the following distinctive elements:

i.    Formatting of logos, graphics, text boxes and text;

ii.    Plain white background with logo in the top left corner of order page;

iii.   Language and placement on order page of "Special Internet Only Offer on VitaPulse";

iv.    Language and placement on order page of "savings on multi-bottle packages";

v.    Placement in upper right corner on order page of toll-free number;

     vi.    Language and placement on order page of "Select a Package to Begin" above three white boxes containing options;

     vii.    Language and placement on order page of "Most Popular" with arrow to the middle white box option;

     viii.    Size and placement on order page of image of product;

     ix.    Language and placement on order page of "90-day Money Back Guarantee" across colored banner with a gold seal;

     x.    Language and placement on the order page of Dr. Bereliani's biography and profile photograph;

     xi.    The language and placement of the "Frequently Asked Questions";

     xii.    Language and placement of the "Supplement Facts" image of product label after the "What's in it?" question;

     xiii.    Language and placement of the "Try it 100% Risk Free" with "Order Now" button directly under it;

     xv.    The overall theme and structure of the order page;

     xiv.    Style, aesthetic, look and feel of order page; and

     xv.    The particularized combination of all of these elements.

c.  Plaintiff Gundry MD's website (a page of which is attached hereto as Exhibit 6A and incorporated herein) constitutes its trade dress and consists of the following distinctive elements:

     i.    Formatting of logos, graphics, text boxes and text;

     ii.    Image of white wood with light green and yellow above it at the top of order page;

     iii.    Language and placement on order page of "ADD THE BOOK" at the top left of order page;

    iv.   Language and placement on order page of "SUBSCRIBE & SAVE" at the top right of order page;

    v.   Language and placement on order page of the three purchasing options and highlight of the "3 Jars" option directly above the orange "BUY NOW" button;

    vi.   Language and placement on the order page of Dr. Gundry's biography and profile photograph;

    vii.   Language and placement on order page of "90-DAY MONEY BACK GUARANTEE" across an image of a seal;

    viii.   The language and placement of the "Frequently Asked Questions", including the "Who should use Prebiothrive?", "How does it work?", "What's in it?", "How do I use it?", "How safe is Gundry Prebiothrive?", and "How many bottles should I order?";

    xvi.   The overall theme and structure of the order page;

    ix.   Style, aesthetic, look and feel of order page; and

    x.   The particularized combination of all of these elements.

61.   Each Plaintiffs' trade dress website is distinctive in that it identifies the source of Plaintiffs' product.

62.   Plaintiffs are informed and believe, and based thereon allege, that there is a substantial likelihood of customer confusion between their websites and those of the following defendants:

    a.   Defendant Digest MD's website (a page of which is attached hereto as Exhibit 3B and incorporated by reference) will be confused with Plaintiff Activated You's website;

    b.   Defendant Digest MD's "Select a Package to Begin" webpage (attached hereto as Exhibit 5B and incorporated by reference) will

be confused with Plaintiff Princeton Nutrient's VitaPulse webpage;

c. Defendant United Probiotic's website (a page of which is attached hereto as Exhibit 6B and incorporated by reference) will be confused with Plaintiff Gundry MD's website.

63. Plaintiffs are informed and believe, and based thereon allege, that each of their respective trade dress are not functional within the meaning of Section 1125 of the Lanham Act, 15 U.S.C. § 1125, et seq.

64. Defendants' acts of trade dress infringement were willful, in disregard of, and in indifference to the rights of Plaintiffs.

65. As a direct and proximate result of Defendants' misconduct, Plaintiffs have sustained and will continue to sustain substantial, immediate and irreparable injury for which there is no adequate remedy at law. Unless enjoined and restrained by this Court, Defendants will continue to infringe on the trade dress of Plaintiffs, cause consumer confusion and cause Plaintiffs to lose sales and diminish their respective market shares.

66. As a result, Plaintiffs are entitled to preliminary and permanent injunctive relief and actual and/or statutory damages against Defendants, in a form and amounts to be determined at trial.

**FOURTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

(Plaintiff Whole Body Research Against Defendants Kofman and Edmonds)

67. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-66 inclusive, as though fully set forth herein.

68. At or about the time Plaintiffs hired Edmonds and Kofman, and as a condition of their employment, Edmonds and Kofman signed Confidentiality Agreements, attached hereto as Exhibits 1 and 2, respectively. Under Paragraph 1 of the Confidentiality Agreements, Edmonds and Kofman agreed to what constituted Plaintiffs' "Confidential Information" as defined therein.

69.    Under Paragraph 1 of the Confidentiality Agreements, Edmonds and Kofman agreed not to disclose any of Plaintiffs' Confidential Information and agreed to maintain its confidentiality.  Under Paragraphs 1 and 12, Edmonds and Kofman agreed that their obligation not to disclose Plaintiffs' Confidential Information was an ongoing obligation that would continue even after their employment with Plaintiffs ended.

70.    Under Paragraph 2 of the Confidentiality Agreements, Edmonds and Kofman agreed to assign, transfer and convey to Plaintiffs all discoveries and works "created, invented, designed, developed, improved or contributed to" by Edmonds and Kofman in connection with their employment.  Per Paragraph 2, the "Discoveries and Works" included, without limitation, all works of authorship, intellectual property, copyrights, drawings, presentations, graphics and audiovisual materials.

71.    Plaintiffs fully performed all of their obligations under the terms and conditions of the Confidentiality Agreement.

72.    On information and belief, Plaintiff alleges that Edmonds and Kofman breached their Confidentiality Agreements by various acts, including without limitation the following:

a.    Disclosing Plaintiffs' Confidential Information to Plaintiffs' competitors, including defendants Digest MD, United Probiotics, Dr. Koduru and/or Dr. Sachar, its employees and/or other persons outside of Plaintiffs, as described above;

b.    Using Plaintiffs' Confidential Information on behalf of themselves and other defendants and against Plaintiffs' interests, as described above;

c.    Unfairly soliciting the business of Plaintiffs' customers for Defendants' own benefit, as described above, including without limitation, directly copying the source code of Plaintiffs' successful websites; and

d.    Using Discoveries and Works developed, improved or contributed to

while employed by Plaintiffs (including without limitation, the banner ad developed by Edmonds described in paragraph 39 herein), for Defendants' gain.

73. As a direct and proximate result of Edmonds and Kofman's contract breaches, Plaintiffs have been damaged in an amount to be determined at trial and in excess of the jurisdictional requirements of this court, together with consequential damages including the loss of business taken by Edmonds and Kofman, in an amount to be proven at trial.

74. Unless restrained, Defendants will continue in the acts and conduct set forth above that have resulted in and will continue to result in irreparable injury to Plaintiffs, for which monetary damages would not afford adequate relief. The exact extent, nature and amount of Plaintiffs' injuries and damages are difficult to ascertain. Plaintiffs therefore request that the Court issue preliminary and permanent injunctions restraining and enjoining Defendants, and anyone acting at on their direction or in concert with them, from misappropriating and/or using Plaintiffs' Confidential Information.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**

18 U.S.C. § 1030, et seq.

(All Plaintiffs Against Defendants Kofman and Edmonds and Does 1-10)

75. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-74 inclusive, as though fully set forth herein.

76. Plaintiffs' computers that Defendants Kofman and Edmonds used while working for Plaintiffs were protected computers within the meaning of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030(e)(2)(B) in that these computers were used in or affecting interstate or foreign commerce or communication.

77. While working for Plaintiffs, Defendants Kofman and Edmonds intentionally, and in excess of their authorized access, accessed Plaintiffs' computers

to obtain Plaintiffs' Confidential Information, in violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030(a)(2)(C).

78. At or around the time Defendants Kofman and Edmonds stopped working for Plaintiffs, these defendants intentionally accessed Plaintiffs' computers without authorization, causing damage and loss to Plaintiffs, in violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030(a)(5)(C). Specifically, Defendants Kofman and Edmonds accessed Plaintiffs' computers and completely wiped them of all data, software and operating systems, causing impairment to the integrity and availability of the data and information of Plaintiffs. As a result of this damage, Plaintiffs had to pay money to attempt to have the systems restored and data recovered from these computers and ultimately, when that failed, pay for installation of operating systems and software to make the computers functional.

79. As a direct and proximate result of Edmonds and Kofman's conduct, Plaintiffs have been damaged in an amount to be determined at trial and in excess of the jurisdictional requirements of this court.

///

80. Unless restrained, Defendants will continue in the acts and conduct set forth above that have resulted in and will continue to result in irreparable injury to Plaintiffs, for which monetary damages would not afford adequate relief. The exact extent, nature and amount of Plaintiffs' injuries and damages are difficult to ascertain. Plaintiffs therefore request that the Court issue preliminary and permanent injunctions restraining and enjoining Defendants, and anyone acting at on their direction or in concert with them, from misappropriating and/or using Plaintiffs' Confidential Information, including the continued use of Defendants Digest MD and United Probiotics' websites.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1. For a preliminary and/or permanent injunction order enjoining Defendants from the continued use of Plaintiffs Nucific, Probiotic America and

Gundry MD's copyrighted material and for an immediate takedown order of same;

2. For a preliminary and/or permanent injunction order enjoining Defendants from the continued use of the trade dress-infringing websites and banner ads currently used by Defendants Digest MD and United Probiotics, and for an immediate takedown order of same;

3. For a preliminary and permanent injunction order enjoining Defendants from using or disclosing any of Plaintiffs' Confidential Information;

4. For an accounting of earnings, revenues and profits related to the disclosure and/or use of Plaintiffs' Confidential Information;

5. For an order granting restitution and disgorgement of any unjust enrichment, wrongful earnings, revenues and/or profits according to proof;

6. For an award of damages according to proof;

7. For the costs of this action;

8. For reasonable attorneys' fees, as provided by law; and

9. For such other and further relief as the Court deems just and proper.

DATED: February 14, 2018

**HENNELLY & GROSSFELD LLP**

By: ______________________

MICHAEL G. KING
JENNIFER M. MILLIER
Attorneys for All Plaintiffs

**JURY TRIAL DEMANDED**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Civil Local Rule 38-1, Plaintiffs hereby demand trial by jury in this action.

DATED: February 14, 2018

**HENNELLY & GROSSFELD LLP**

By: ______________________

MICHAEL G. KING
JENNIFER M. MILLIER
Attorneys for All Plaintiffs

# EMPLOYEE CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

01/15/2015

This Employee Confidentiality and Non-Disclosure Agreement (the "Agreement") is effective as ~~of January 1, 2010 (the~~ "Effective Date") and entered into by and between Whole Body Research, LLC. (the "Company") and Alan Kofman ("Employee").

WHEREAS, the Company has retained or is contemplating retaining the Employee to provide various services on behalf of the Company in connection with the support of product development and marketing related to the Company's business enterprises, including but not limited to, the production, marketing and distribution of self-help and informational videos.

WHEREAS, the Company has received from third parties, has developed, or owns financial, technical, operational, marketing, administrative and/or business information, process and/or procedures that it deems confidential and/or proprietary (collectively the "Confidential Information" as further defined below);

WHEREAS, the Company believes that the unauthorized usage or disclosure of the Confidential Information could be detrimental to its business interests; and

WHEREAS, the Company needs to disclosure such Confidential Information to the Employee but only for the purpose of allowing the Employee to perform on behalf of the Company in connection with the business of the Company.

In consideration of Employee's employment and/or continued employment by the Company, the compensation now and later paid to Employee and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee agrees as follows:

1. Confidential Information.

(a) Company Information. Employee shall at all times during the term of Employee's employment with the Company and thereafter, hold in strictest confidence, and not use, except for the benefit of the Company, or disclose to any person, firm or corporation without written authorization of the Partners, any Confidential Information of the Company. As used herein, "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, formulas, services, customer lists and customers (including, but not limited to, customers of the Company on whom Employee has called or with whom he or she became acquainted during the term of Employee's employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to Employee by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment. "Confidential Information" does not include any of the foregoing items, which have become publicly known and made generally available through no wrongful act of Employee or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

(b) Former Employer Information. Employee shall not, during Employee's employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and Employee shall not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c) Third-Party Information. Employee shall hold all confidential or proprietary information that the Company has received from any third party to which it is the Company's obligation to maintain the confidentiality of such information and to use it only for certain limited purposes in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third party.

2. Ownership of Intellectual Property. The Employee hereby irrevocably assigns, transfers, and conveys to the Company to the maximum extent permitted by applicable law all rights, title, and interest now and hereinafter acquired, in and to all Discoveries and Works (as defined below) created, invented, designed, developed, improved or contributed to by either the Company or the Employee in connection with any services rendered by the Employee on behalf of the Company. The terms "Discoveries and Works" include all works of authorship, inventions, intellectual property, materials, documents, or other work product (including, without limitation, copyrights, drawings, photographs, schedules, specifications, material boards, samples and information for reference, designs, patents, and patent applications, presentations, textual works, graphics and audiovisual materials). Upon the request of the Company, the Employee shall promptly deliver to the Company all such Discoveries and Works and shall execute and deliver any documents, and to take any further actions requested by the Company to assist it in validating, effectuating, maintaining, protecting, enforcing, performing, enforcing, perfecting, recording, patenting, or registering any of its rights hereunder, and the Employee shall renounce any and all claims, including, without limitation, claims of ownership and royalty, with respect to all Discoveries and Works and all other property owned or licensed by the Company.

3. Conflicting Employment. Employee shall not, during the term of Employee's employment with the Company, engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of Employee's employment, nor will he or she engage in any other activities that conflict with Employee's obligations to the Company.

4. Returning Company Documents. At the time of leaving the employ of the Company, Employee covenants that he shall deliver to the Company (and will not keep in Employee's possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by Employee pursuant to Employee's employment with the Company or otherwise belonging to the Company, its successors or assigns, without limitation. In the event of the termination of Employee's employment, Employee hereby covenants to sign and deliver the "Termination Certification" attached hereto as Exhibit A.

5. Notification of New Employer. In the event that Employee leaves the employ of the Company, Employee consents to notification by the Company to Employee's new employer about Employee's rights and obligations under this Agreement.

6. Solicitation of Employees. Employee covenants that, for a period of twelve (12) months immediately following the termination of Employee's relationship with the Company for any reason, whether with or without cause, he shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for Employee or for any other person or entity.

7. Conflict of Interest Guidelines. Employee covenants that he agrees with and shall diligently adhere to the Conflict of Interest Guidelines attached as Exhibit B hereto.

8. Notice Clause.

(a) Manner. Any notice hereby required or permitted to be given shall be sufficiently given if in writing and delivered in person or sent by First Class, registered or certified mail, postage prepaid to either party at the address of such party or such other address as shall have been designated by written notice by such party to the other party.

(b) Effectiveness. Any notice or other communication required or permitted to be given under this Agreement will be deemed given on the day when delivered in person, or the **third business day** after the day on which such notice was mailed in accordance with this Section.

9. Arbitration.

(a) Except as provided in Section 8(c) below, the Company and Employee agree that any dispute or controversy arising out of, relating to, or in connection with Employee's employment with the Company or with this Agreement, or the interpretation, validity, construction, performance, breach, or termination of this Agreement, shall be finally settled by binding arbitration before one arbitrator in Los Angeles County, California under the National Rules for the Resolution of Employment Disputes of the American Arbitration Association as then in effect (the "Rules"). The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration, and judgment may be entered on the decision of the arbitrator in any court having jurisdiction.

(b) The arbitrator shall apply California law to the merits of any dispute or claim, without reference to rules of conflicts of law.

(c) The parties may apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other interim or conservatory relief, as necessary, without bond, without breaching this arbitration agreement and without abridging the powers of the arbitrator.

**(d) EMPLOYEE HAS READ AND UNDERSTANDS THIS SECTION, WHICH DISCUSSES ARBITRATION. EMPLOYEE UNDERSTANDS THAT BY SIGNING THIS AGREEMENT, EMPLOYEE AGREES TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF TO BINDING ARBITRATION AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTIONOF ALL DISPUTES RELATING TO EMPLOYEE'S RELATIONSHIP WITH THE COMPANY, INCLUDING BUT NOT LIMITED TO, CLAIMS OF HARASSMENT, DISCRIMINATION, WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS.**

10. Severability. The invalidity or unenforceability of any provision of this Agreement, or any terms hereof, shall not affect the validity or enforceability of any other provision or term of this Agreement.

11. Integration. This Agreement represents the entire agreement and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. No waiver, alteration, or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by duly authorized representatives of the parties hereto.

12. Successors, Assigns and Survival. This Agreement shall be binding on Employee's heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors and assigns. The terms of this Agreement shall survive the termination of Employee's employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

13. At-Will Employment. Employee agrees that nothing in this Agreement shall confer any right to continued employment by the Company, nor shall it interfere in any way with Employee's right or the Company's right to terminate Employee's employment at any time, for any reason, with or without, and with or without notice.

14. Governing Law. This Agreement shall be governed by and construed in accordance with the internal substantive laws, but not the choice of law rules, of the state of California.

15. Right to Advice of Counsel. Employee acknowledges that he or she has had the right to consult with counsel before signing this Agreement and is fully aware of Employee's rights and obligations under this Agreement.

16. Counterparts. This Agreement may be executed by facsimile and in any number of counterparts, each of which shall be an original, and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by their duly authorized officers, as of the day and year first above written.

Alan Kofman
PRINT NAME:

3/6/15
DATE:

[signature]
SIGNATURE

[signature]
Mark Clemens
Partner

Curt R. Clemens
Partner

Craig Clemens
Partner

Josh Golder
Partner

**EXHIBIT A:**

Whole Body Research, LLC.
**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Whole Body Research, LLC., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Confidentiality Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidentiality Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not hire any employees of the Company and I will not solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

Signature

Date

# EMPLOYEE CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Employee Confidentiality and Non-Disclosure Agreement (the "Agreement") is effective as of January 1, 2010 (the "Effective Date") and entered into by and between Whole Body Research, LLC. (the "Company") and Christian Edmonds ("Employee").

WHEREAS, the Company has retained or is contemplating retaining the Employee to provide various services on behalf of the Company in connection with the support of product development and marketing related to the Company's business enterprises, including but not limited to, the production, marketing and distribution of self-help and informational videos.

WHEREAS, the Company has received from third parties, has developed, or owns financial, technical, operational, marketing, administrative and/or business information, process and/or procedures that it deems confidential and/or proprietary (collectively the "Confidential Information" as further defined below);

WHEREAS, the Company believes that the unauthorized usage or disclosure of the Confidential Information could be detrimental to its business interests; and

WHEREAS, the Company needs to disclosure such Confidential Information to the Employee but only for the purpose of allowing the Employee to perform on behalf of the Company in connection with the business of the Company.

In consideration of Employee's employment and/or continued employment by the Company, the compensation now and later paid to Employee and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee agrees as follows:

1. Confidential Information.

(a) Company Information. Employee shall at all times during the term of Employee's employment with the Company and thereafter, hold in strictest confidence, and not use, except for the benefit of the Company, or disclose to any person, firm or corporation without written authorization of the Partners, any Confidential Information of the Company. As used herein, "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, formulas, services, customer lists and customers (including, but not limited to, customers of the Company on whom Employee has called or with whom he or she became acquainted during the term of Employee's employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to Employee by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment. "Confidential Information" does not include any of the foregoing items, which have become publicly known and made generally available through no wrongful act of Employee or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

(b) Former Employer Information. Employee shall not, during Employee's employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and Employee shall not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c) Third-Party Information. Employee shall hold all confidential or proprietary information that the Company has received from any third party to which it is the Company's obligation to maintain the confidentiality of such information and to use it only for certain limited purposes in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third party.

2. Ownership of Intellectual Property. The Employee hereby irrevocably assigns, transfers, and conveys to the Company to the maximum extent permitted by applicable law all rights, title, and interest now and hereinafter acquired, in and to all Discoveries and Works (as defined below) created, invented, designed, developed, improved or contributed to by either the Company or the Employee in connection with any services rendered by the Employee on behalf of the Company. The terms "Discoveries and Works" include all works of authorship, inventions, intellectual property, materials, documents, or other work product (including, without limitation, copyrights, drawings, photographs, schedules, specifications, material boards, samples and information for reference, designs, patents, and patent applications, presentations, textual works, graphics and audiovisual materials). Upon the request of the Company, the Employee shall promptly deliver to the Company all such Discoveries and Works and shall execute and deliver any documents, and to take any further actions requested by the Company to assist it in validating, effectuating, maintaining, protecting, enforcing, performing, enforcing, perfecting, recording, patenting, or registering any of its rights hereunder, and the Employee shall renounce any and all claims, including, without limitation, claims of ownership and royalty, with respect to all Discoveries and Works and all other property owned or licensed by the Company.

3. Conflicting Employment. Employee shall not, during the term of Employee's employment with the Company, engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of Employee's employment, nor will he or she engage in any other activities that conflict with Employee's obligations to the Company.

4. Returning Company Documents. At the time of leaving the employ of the Company, Employee covenants that he shall deliver to the Company (and will not keep in Employee's possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by Employee pursuant to Employee's employment with the Company or otherwise belonging to the Company, its successors or assigns, without limitation. In the event of the termination of Employee's employment, Employee hereby covenants to sign and deliver the "Termination Certification" attached hereto as Exhibit A.

5. Notification of New Employer. In the event that Employee leaves the employ of the Company, Employee consents to notification by the Company to Employee's new employer about Employee's rights and obligations under this Agreement.

6. Solicitation of Employees. Employee covenants that, for a period of twelve (12) months immediately following the termination of Employee's relationship with the Company for any reason, whether with or without cause, he shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for Employee or for any other person or entity.

7. Conflict of Interest Guidelines. Employee covenants that he agrees with and shall diligently adhere to the Conflict of Interest Guidelines attached as Exhibit B hereto.

8. Notice Clause.

(a) Manner. Any notice hereby required or permitted to be given shall be sufficiently given if in writing and delivered in person or sent by First Class, registered or certified mail, postage prepaid to either party at the address of such party or such other address as shall have been designated by written notice by such party to the other party.

(b) Effectiveness. Any notice or other communication required or permitted to be given under this Agreement will be deemed given on the day when delivered in person, or the **third business day** after the day on which such notice was mailed in accordance with this Section.

9. Arbitration.

(a) Except as provided in Section 8(c) below, the Company and Employee agree that any dispute or controversy arising out of, relating to, or in connection with Employee's employment with the Company or with this Agreement, or the interpretation, validity, construction, performance, breach, or termination of this Agreement, shall be finally settled by binding arbitration before one arbitrator in Los Angeles County, California under the National Rules for the Resolution of Employment Disputes of the American Arbitration Association as then in effect (the "Rules"). The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration, and judgment may be entered on the decision of the arbitrator in any court having jurisdiction.

(b) The arbitrator shall apply California law to the merits of any dispute or claim, without reference to rules of conflicts of law.

(c) The parties may apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other interim or conservatory relief, as necessary, without bond, without breaching this arbitration agreement and without abridging the powers of the arbitrator.

**(d) EMPLOYEE HAS READ AND UNDERSTANDS THIS SECTION, WHICH DISCUSSES ARBITRATION. EMPLOYEE UNDERSTANDS THAT BY SIGNING THIS AGREEMENT, EMPLOYEE AGREES TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF TO BINDING ARBITRATION AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTIONOF ALL DISPUTES RELATING TO EMPLOYEE'S RELATIONSHIP WITH THE COMPANY, INCLUDING BUT NOT LIMITED TO, CLAIMS OF HARASSMENT, DISCRIMINATION, WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS.**

10. Severability. The invalidity or unenforceability of any provision of this Agreement, or any terms hereof, shall not affect the validity or enforceability of any other provision or term of this Agreement.

11. Integration. This Agreement represents the entire agreement and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. No waiver, alteration, or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by duly authorized representatives of the parties hereto.

12. Successors, Assigns and Survival. This Agreement shall be binding on Employee's heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors and assigns. The terms of this Agreement shall survive the termination of Employee's employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

13. At-Will Employment. Employee agrees that nothing in this Agreement shall confer any right to continued employment by the Company, nor shall it interfere in any way with Employee's right or the Company's right to terminate Employee's employment at any time, for any reason, with or without, and with or without notice.

14. Governing Law. This Agreement shall be governed by and construed in accordance with the internal substantive laws, but not the choice of law rules, of the state of California.

15. Right to Advice of Counsel. Employee acknowledges that he or she has had the right to consult with counsel before signing this Agreement and is fully aware of Employee's rights and obligations under this Agreement.

16. Counterparts. This Agreement may be executed by facsimile and in any number of counterparts, each of which shall be an original, and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by their duly authorized officers, as of the day and year first above written.

Christian Edmonds
PRINT NAME:

03/14/2014
DATE

SIGNATURE

Mark Clemens
Partner

Curt R. Clemens
Partner

Craig Clemens
Partner

Josh Golder
Partner

**EXHIBIT A:**

Whole Body Research, LLC.
**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Whole Body Research, LLC., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Confidentiality Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidentiality Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not hire any employees of the Company and I will not solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

Signature

03/14/2014
Date



My Special Internet Only Offer To First Time Customers...

Availability: IN STOCK

Ships to you the next business day.

## Frequently Asked Questions

**Q: How should I use Advanced Restorative Probiotic?**

**A:** It's simple – just take 1 of our easy-swallow, 100% vegetarian capsules each day, with a full glass of water. We suggest taking your daily dose of Advanced Restorative Probiotic with a meal for optimal results.

**Q: Who should use Advanced Restorative Probiotic?**

**A:** This formula is designed to support total-body wellness from the inside out. It is perfect for anyone who wants to enjoy more comfortable, regular digestion, better energy levels and moods, more radiant skin, and improved overall health.

**Q: How safe is Advanced Restorative Probiotic?**

**A:** Safety is our number one priority here at ActivatedYou, so all of our products go through rigorous testing for quality, purity and potency at an independent, 3rd-party facility.

**Q: What if Advanced Restorative Probiotic doesn't work for me?**

**A:** We're proud of our products so we stand behind them, 100%. That's why Advanced Restorative Probiotic is covered by our 90-day ActivatedYou Promise. If you're not thrilled by your results for any reason, just contact our customer service team – we'll refund your purchase, no questions asked.

## Ready to try ActivatedYou For Yourself?

Thousands of people have completely transformed their digestive health with ActivatedYou and I want you to too. If you have never tried a high quality probiotic before, I encourage you to take advantage of my special offer here and see for yourself exactly what a probiotic can do for you.

Click the button below to view our order options and I hope to hear your success story with all the others!

View Order Options

Digest MD™

(855) 217-6916

My Special Internet Only Offer To First Time Customers...

Availability: IN STOCK

Ships to you the next business day.

CHOOSE YOUR PACKAGE
6 Bottles
3 Bottles
1 Bottle
Retail: ~~$179.00~~
Save 79$
Your Price: $99.00
(This is a one time payment)
Get Started
Free Shipping

100% MONEY BACK
90
DAYS
GUARANTEE

Every order from Digest MD™ is backed by our 100% money back satisfaction guarantee. Try it for up to 90 days and if you aren't thrilled with the results, just send back the empty bottles for a full refund.

## Frequently Asked Questions

**Q: How Many Bottles Are Recommended To Order?**

**A:** Most customers enjoy taking advantage of our discounted three bottle option. For those who wish to share with their families, or want to take advantage of our highest possible discount, we recommend investing in the best pricing and value with our 6-bottle option. And because Elite Biotics™ stays good for years, you save on larger orders and also avoid having to re-order often.

**Q: Do I need to refrigerate Elite Biotics™?**

**A:** Our probiotics are flash-frozen and packed so that each bottle can stay fresh for years. It isn't necessary to refrigerate Elite Biotics™ for the formula to stay its its prime level of effectiveness and freshness.

**Q:Who should use Elite Biotics™?**

**A:** Elite Biotics™ can be especially effective for anyone who suffers from any sort of digestive issues, including bloating, indigestion, or gas. Because processed sugars, artificial sweeteners, and other unnatural ingredients are commonly found in the majority of food in America, Elite Biotics™ can be a healthy addition to anyone's diet regardless of age.

**Q: Is it safe?**

**A:** Yes, absolutely. Elite Biotics™ has been formulated entirely with natural ingredients. The capsules we use are of the highest quality and are kosher, allergen-free, vegetarian capsules, it doesn't matter what dietary restrictions you have.

## Ready to give Elite Biotics™ For Yourself?

We have had thousands of people that have completely transformed their digestive health with Elite Biotics™ and I want you to try it for yourself too. If you have never tried a a probiotic with this type of potency before, I encourage you to take advantage of my special offer here and see for yourself exactly what a probiotic can do for your body.

Click the button below to view our order options and I hope to hear your success story with all the others!

```
<!DOCTYPE html>
<html lang="en">
<head>
    <meta charset="UTF-8">
    <title>ActivatedYou - Secure Orders</title>
    <link rel="stylesheet" type="text/css" href="css/ftc_170125.css">
    <style type="text/css">
        #packages{text-align: center;}
        #packages h2{color: #fff; background-color: #ff671f; padding: 10px 0; margin-bottom: 15px; margin-top: 0;}
        #packages p.regular{margin-top: 20px;}
        #packages p.otp{font-size: 15px; margin: 3px 0;}
        #packages p.memSave{font-size: 20px; color: #dd0000;}
        #packages hr{width: 50px;}
        #packages .btlImg{vertical-align: top; width: 200px; margin-right: 30px}
        #packages .save{margin-top: 0;}
        #packages .shipping{margin-bottom: 20px}
        #packages .mbgSection p{font-size: 16px;}
        #inputy{position: absolute; z-index: 100; opacity: 0; height: 30px; width: 30px; left: 0; top: -6px; cursor:
pointer;}
        #sub-check{display: none;}
        #sub-check.active{display: block;}
        .ayBullet{list-style-type: none; font-size: 15px; padding: 0;}
        .ayBullet li{background: url(img/small-black-check.png) no-repeat left center; padding-left: 20px; margin: 5px 0;}
        .red-check{position: absolute; top: -9px; left: -13px; width: 50px; max-width: 50px; display: none;}
        .checkbox{border: 1px solid #b7b7b7; border-radius: 5px; background-color: #fff; width: 23px; height: 23px; display:
inline-block; vertical-align: -6px; margin-right: 8px; position: relative; cursor: pointer; float: left; margin-bottom:
15px;}
        .clear{clear: both;}
        .choose{display: inline-block; text-align: center; box-shadow: 0px 0px 10px #8C8C83; width: 355px; background-color:
#fff; position: relative; z-index: 3;}
        .continuity{width: 300px; display: inline-block; box-shadow: 0px 0px 10px #8C8C83; margin-left: -5px; z-index: 2;
position: relative; vertical-align: 30px;}
        .continuity ul{text-align: left;}
        .continuity .content{padding: 0 15px 10px;}
        .continuity .content .labelCont{position: relative; font-size: 14px;}
        .continuity .content .labelCont .moreInfo{display: none; position: absolute; border: 1px solid #000; background-
color: #fff; padding: 5px; right: -240px; bottom: -40px; font-size: 13px;}
        #packages .continuity .content .labelCont .moreInfo p{font-size: 12px; text-align: center; padding: 10px;}
        .continuity .content .labelCont .moreInfo.active{display: block;}
        .continuity .content .labelCont label{display: block; cursor: pointer; border-radius: 5px; background-color:
rgba(255, 103, 48, .48); padding: 8px; box-shadow: 2px 2px 5px 0px rgba(220,220,221,1);}
        .continuity .content .labelCont{text-align: left;}
        .btl{width: 95px; display: inline-block; cursor: pointer; background-color: #f2f2f2; padding: 20px 0; font-size:
20px; border: 2px solid #f2f2f2;}
        .btl.threeBtl{padding:30px 0; margin: 0 10px;}
        .btl.active{background-color: #ffc4a8; border: 2px solid #ff671f;}
        .mbgSection{width: 200px; display: inline-block; margin-left: 20px; vertical-align: 20px;}
        .mbgSection img{width: 230px;}
        .price span{font-size: 15px;}
    </style>
    <!--[if lt IE 9]>
        <script src="https://html5shiv.googlecode.com/svn/trunk/html5.js"></script>
    <![endif]-->
</head>
<body>
    <div id="header">
        <div class="container">
            <p class="right">800-720-8403</p>
            <img src="/img/ayLogo.jpg" alt="">
            <div class="clear"></div>
        </div>
    </div>
    <div id="sectionOne">
        <div class="container">
            <h1 class="lighter">My Special Internet Only Offer To First Time Customers...</h1>
        </div>
    </div>
    <div id="main">
        <div class="container">
            <h3 class="lighter">Availability: <span class="green">IN STOCK</span></h3>
            <h3 class="lighter">Ships to you the next business day.</h3>
            <div id="packages">

                <div class="choose">
                    <h2 class="white">CHOOSE YOUR PACKAGE</h2>
                    <div class="btl sixBtl">
                        <p>6 Bottles</p>
                    </div>
                    <div class="btl threeBtl active">
                        <p>3 Bottles</p>
                    </div>
                    <div class="btl oneBtl">
                        <p>1 Bottle</p>
                    </div>
                    <p class="regular">Retail: <s>$209.85</s></p>
                    <p class="save">Save 49%</p>
                    <p class="memSave"></p>
                    <hr>
                    <p class="price">Your Price: $107.86</p>
```

```
<!DOCTYPE html>
<html lang="en">
<meta http-equiv="content-type" content="text/html;charset=UTF-8" /><!-- /Added by HTTrack -->
<head>
    <meta charset="UTF-8">
    <title></title>
    <link rel="stylesheet" type="text/css" href="css/ftc_170125.css">
    <style type="text/css">
        #packages{
            //text-align: center;
        }
        #packages h2{color: #fff; background-color: #1185ca; padding: 10px 0; margin-bottom: 15px; margin-top: 0;}
        #packages p.regular{margin-top: 20px;}
        #packages p.otp{font-size: 15px; margin: 3px 0;}
        #packages p.memSave{font-size: 20px; color: #dd0000;}
        #packages hr{width: 50px;}
        #packages .btlImg{vertical-align: top; width: 200px; margin-right: 30px}
        #packages .save{margin-top: 0;}
        #packages .shipping{margin-bottom: 20px}
        #packages .mbgSection p{font-size: 16px;}
        #inputy{position: absolute; z-index: 100; opacity: 0; height: 30px; width: 30px; left: 0; top: -6px; cursor:
pointer;}
        #sub-check{display: none;}
        #sub-check.active{display: block;}
        .ayBullet{list-style-type: none; font-size: 15px; padding: 0;}
        .ayBullet li{background: url(img/small-black-check.png) no-repeat left center; padding-left: 20px; margin: 5px 0;}
        .red-check{position: absolute; top: -9px; left: -13px; width: 50px; max-width: 50px; display: none;}
        .checkbox{border: 1px solid #b7b7b7; border-radius: 5px; background-color: #fff; width: 23px; height: 23px; display:
inline-block; vertical-align: -6px; margin-right: 8px; position: relative; cursor: pointer; float: left; margin-bottom:
15px;}
        .clear{clear: both;}
        .choose{display: inline-block; text-align: center; box-shadow: 0px 0px 10px #8C8C83; width: 355px; background-color:
#fff; position: relative; z-index: 3;}
        .continuity{width: 300px; display: inline-block; box-shadow: 0px 0px 10px #8C8C83; margin-left: -5px; z-index: 2;
position: relative; vertical-align: 30px;}
        .continuity ul{text-align: left;}
        .continuity .content{padding: 0 15px 10px;}
        .continuity .content .labelCont{position: relative; font-size: 14px;}
        .continuity .content .labelCont .moreInfo{display: none; position: absolute; border: 1px solid #000; background-
color: #fff; padding: 5px; right: -240px; bottom: -40px; font-size: 13px;}
        #packages .continuity .content .labelCont .moreInfo p{font-size: 12px; text-align: center; padding: 10px;}
        .continuity .content .labelCont .moreInfo.active{display: block;}
        .continuity .content .labelCont label{display: block; cursor: pointer; border-radius: 5px;background-color: #1185ca;
padding: 8px; box-shadow: 2px 2px 5px 0px rgba(220,220,221,1);}
        .continuity .content .labelCont{text-align: left;}
        .btl{width: 95px; display: inline-block; cursor: pointer;     background-color: #1185ca; padding: 20px 0; font-size:
20px; border: 2px solid #f2f2f2;}
        .btl.threeBtl{padding:30px 0; margin: 0 10px;}
        .btl.active{background-color: rgba(39, 132, 187, 0.47); border: 2px solid #1185ca;}
        .mbgSection{width: 200px; display: inline-block; margin-left: 20px; vertical-align: 20px;}
        .mbgSection img{width: 230px;}
        .price span{font-size: 15px;}
        #packages p {
    margin: 0;
    font-size: 20px;
    color: white;
}
#finalCTA {
    text-decoration: none;
    border: 2px solid #1185ca;
    padding: 10px;
    font-weight: 200;
    font-size: 30px;
    color: #1185ca;
}
#packages p.regular {
    margin-top: 20px;
    color: black;
}
#packages p.otp {
    font-size: 15px;
    margin: 3px 0;
    color: black;
}
#packages .shipping {
    margin-bottom: 20px;
    color: black;
}
#packages p {
    color: #151313;
}
    </style>
    </head>
<body>
    <div id="header">
        <div class="container">
            <p class="right">(855) 217-6916</p>
            <img src="/images/logo5.png" alt="">
            <div class="clear"></div>
```

PRINCETON NUTRIENTS

1-866-427-3019

## Special Internet-Only Offer on VitaPulse

We're offering **savings on multi-bottle packages**. This allows us to save on the cost of processing each order individually, savings that we pass on to you.

## Select a Package to Begin

Most Popular
Best Value
6 Bottles of VitaPulse
6 month supply
Regular Price: $402
Instant Savings: $167
$235
Get Started
Free Shipping
Protect & Revitalize
3 Bottles of VitaPulse
3 month supply
Regular Price: $201
Instant Savings: $74
$127
Get Started
Free Shipping
Try 1 Bottle
1 Bottle of VitaPulse
1 month supply
Regular Price: $67
Instant Savings: $18
$49
Get Started
+ $6.95 Shipping
VitaPulse

VitaPulse is backed by a 90-day Money-Back Guarantee. If you don't experience an immediate difference in your body, send back your bottle for a full refund - no questions asked.

MONEY BACK
100%
GUARANTEE

### Dr. Bereliani

*Board Certified Cardiologist,*
*Director at Beverly Hills Institute of Cardiology & Preventative Medicine*

Dr. Bereliani is a fellow of the American College of Cardiology and an active member of the American Heart Association, the American Medical Association, ASNC the American Society of Nuclear Cardiology (ASNC), the Society of Nuclear Cardiology (SNM), the American Academy of Anti-Aging Medicine (A4M) and the American College for Advancement in Medicine (ACAM).

Through our partnership with Pencils of Promise, a portion of every sale goes towards making education available for more children. Our first goal is to build a new school by July. Your order will help Pencils of Promise fulfill their mission of providing children with access to quality education.
93
students served by the average build
20
years is the lifetime value per school
$35K
is the avg. cost of a 4-room PoP school
PENCILS OF PROMISE

## Frequently Asked Questions

**Q: How many bottles should I order?**

The average order for new customers is 3 bottles and that's what we recommend to start. However, because we have many repeat customers, we offer the 6 bottle package so you can take advantage of our best pricing.

**Q: What's in it?**

VitaPulse contains 3 key ingredients: NAC, PQQ, CoQ10.

**Supplement Facts**
Serving Size: 1 Capsule
Servings per Container: 30

| Amount Per Serving | | % Daily Value |
|---|---|---|
| N-Acetyl-Cysteine (NAC) | 250mg | ** |
| CoQ10 | 100mg | ** |
| Pyrroloquinoline Quinone (PQQ) | 10mg | ** |

**% Daily Value not established

Other Ingredients: Hypromellose (vegetable capsule), Rice Flour, Silicon Dioxide, Magnesium Stearate.

*These statements have not been evaluated by The Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.

**Q: How shoud I take VitaPulse?**

The recommended dosage is 1 capsule a day. To help you stay consistent, we recommend making it a habit of taking VitaPulse first thing in the morning. It is okay to take on an empty stomach. Our capsules are small and very easy to swallow.

**Q: How do I know it will work for me?**

While we cannot guarantee that VitaPulse will work for everybody, we receive emails and phone calls everyday from customers who are excited about the results they are feeling in their bodies. In the unlikely event that you are not satisfised for any reason, you're covered by our 90-day, no-questions-asked, money-back guarantee.

**Q: Is my order secure?**

Princeton Nutrients implements a variety of security measures to maintain the safety of your personal information.

When you place an order or access your personal information, everything goes through a secure server. All of your personal information, including credit card number, name, and address, is transmitted via Secure Socket Layer (SSL) technology — the industry standard for secure online transactions.

If you would rather not shop online, you can place your order over the phone by contacting Customer Service at 1-866-427-3019 (5AM to 7PM PT, M-F and 6AM to 4:30PM Sat & Sun)

Try It 100% Risk-Free

Order Now

**Exhibit 5A**

Terms and Conditions | Privacy Policy

2017 © Copyright Princeton Nutrients, LLC . All Rights Reserved.

These statements have not been evaluated by the Food and Drug Administration. The products and services found on this website are not intended to diagnose, treat, cure, or prevent any disease of any kind. These products and service are not intended for this with pre-existing medical conditions. Please use only as directed. Consult with you Physician if any of these products are right for you before beginning any prescription drug. Consult your Pediatrician before giving any of these products to a child under 18 years of age. Free shipping on selected items.



Exhibit 5B

37



Special Internet-Only Offer on Gundry MD Prebiothrive
Helps with weight management
Increases appetite control
Helps reduce cravings for sweets and junk foods
Promotes smoother digestion with less gas, bloating, & discomfort
OPTIONAL:
ADD THE BOOK
Supercharge the benefits of PrebioThrive with Dr. Gundry's revolutionary diet program
YES! I want to add Dr. Gundry's Diet Evolution for $9.95.
CHOOSE YOUR PACKAGE
6 JARS
3 JARS
1 JAR
Regular Price: $237.00
Instant Savings: $105.00
$132.00
(This is a one time payment)
Buy Now
FREE SHIPPING
OPTIONAL:
SUBSCRIBE & SAVE
Greater savings
Lock in low price
Guaranteed availability
Cancel anytime
YES! I want to sign up for GUNDRY VIP CLUB and Save 10%!

MONEY BACK
90 DAY
GUARANTEE

## 100% MONEY BACK GUARANTEE

We work hard to formulate the most advanced products on the market. Our 90-Day Customer Satisfaction Guarantee is designed to give you ample opportunity to experience optimal results from your product, completely risk-free.

charity: water

A portion of the proceeds from every Gundry MD purchase is donated to charity:water, which provides safe, clean drinking water to people in developing countries.

100%

100% Of Donations Go Straight To Those In Need

## DR. GUNDRY

Dr. Steven Gundry, MD is one of the world's most celebrated pediatric heart surgeons, and the author of the best-selling book "Dr. Gundry's Diet Evolution." He is the director of the International Heart & Lung Institute in Palm Springs, CA, and the founder / director of the Center for Restorative Medicine in Palm Springs and Santa Barbara.

## FAQs

**Who Should Use Prebiothrive?**
Anyone who is plagued by food cravings, would like to get their eating habits under control, improve their digestion, and/or has trouble losing weight no matter how much they work out.

**How Does It Work?**
Our breakthrough formula uses a potent combination of prebiotics to support the "good" bacteria in your gut by supplying the nutrition to help them thrive. At the same time, the formula helps reduce the number – and impact – of the "bad" bacteria. The result is a healthier digestive tract, feelings of increased energy, and a healthier appetite to support better metabolism.

**What's In It?**
PrebioThrive contains three unique ingredients:

BIMUNO
Known to reduce abdominal discomfort

ORGANIC ACACIA
Helps improve the digestive process

AGAVE INULIN
which supports bone health by increasing your body's absorption of calcium, and magnesium

Together they create a formula that can completely revitalize your gut, no matter how out of balance it is.

**How Do I Use It?**
Simply mix 1 scoop into any beverage and drink, 2 – 3 times a day.

**How Safe Is Gundry Prebiothrive? Are There Any Side Effects?**
Gundry PrebioThrive contains only 100% natural and safe ingredients. The formula is tested for safety, quality, and purity at an independent, 3rd-party facility. There are NO reported side-effects. However, as a physician I recommend consulting with your own health care provider before beginning any new program.

**How Many Bottles Should I Order?**
The most popular order for new customers is the 3 jar package, and that's what I recommend to start with. However, because we have many repeat customers, we offer the 6 jar package so you can take advantage of even deeper discounts.

**What If I Don't See The Results I Wanted?**
PrebioThrive is covered by our 90-Day Money Back Guarantee. If for any reason you don't experience the results you're looking for with PrebioThrive, contact our customer service team at (800) 852-0477 Monday-Friday, 5am to 7pm PST or Saturday-Sunday, 6am to 4:30 PM PST and we'll refund your money, no questions asked. Our team is also happy to answer any questions you may have.

---

90 DAY
PREBIOTHRIVE

## GUNDRY MD PREBIOTHRIVE

This formula was designed to help reduce your appetite for unhealthy foods and decrease tendencies to overeat by attacking at the source – the microbiome in your gut. A combination of powerful prebiotics feeds beneficial bacteria and starves the detrimental ones to rebalance your digestive tract, and help improve weight management.

BUY NOW

United Probiotics

McAfee SECURE TRUSTe

YOUR ORDER IS SAFE AND SECURE

# Special Internet-Only Offer on Biotic 365

- Helps with weight management
- Helps reduce cravings for sweets and junk foods
- Increases appetite control
- Promotes smoother digestion with less bloating

BONUS:
**DR. SACHAR'S BOOK**

Supercharge the benefits of Biotic 365 with Dr. Sachar's revolutionary diet program

This item is automatically **included for FREE** with your purchase.

**Choose Your Package:**

3 Boxes

Regular Price: $214.00
**Instant Savings: $95.00**

**$119.00**
(This is a one time payment)

**Buy Now ▶**

FREE SHIPPING

OPTIONAL:
**SUBSCRIBE & SAVE**

- Greater savings
- Lock in low price
- Guaranteed availability
- Cancel anytime

OFF Signup for the **United VIP Club** and Save Over 10%+

**"Get Results or It's Free" 90-Day Guarantee**

We stand behind Biotic 365 and look forward to hearing your success story. However, if you're not 100% satisfied with Biotic 365 within 90 days, give us a call and we will promptly refund your investment, no questions asked!

## Dr. Susan Sachar

Dr. Su Sachar is a well known double-board-certified Gastroenterologist. In her practice, she focuses on nutrition, wellness and weight management. She educates patients and provides each one with an evidence-based diet plan. Her goal is to offer proven health solutions that work.

## FAQs:

### How many boxes do you recommend I order?

The majority of our customers enjoy taking advantage of the discounted three box option. This ensures you give your gut health the maximum jump start. If you have children and/or want your family to enjoy great gut health as well, we recommend you consider our 6-box option. This also gives you the maximum savings. Remember, these prices are for first-time customers only and you will lock in your discounted price for life.

### Do I need to refrigerate Biotic 365?

Our probiotics are flash-frozen and packed so that each box can stay fresh for years. As a result, you don't need to refrigerate Biotic 365 for the formula to retain its prime level of effectiveness and freshness.

### What's in Biotic 365?

Click below to see the nutritional label for Biotic 365.

### Who should use Biotic 365?

Biotic 365 can be especially effective if you suffer from food cravings and want to reduce any stubborn belly fat. Plus, it helps promote relief from any sort of digestive issues, including bloating, indigestion, or gas. Because processed sugars, artificial sweeteners, and other unnatural ingredients are found in the majority of food in America, Biotic 365 can be a healthy addition to anyone's diet regardless of age.

### Is Biotic 365 safe?

Yes! Biotic 365 has been formulated entirely with natural ingredients. The capsules we use are of the highest quality and are kosher, allergen-free, vegetarian capsules. It is safe to use regardless of any dietary restrictions you have.

### How long will it take before I start seeing differences?

It's a case by case situation, everyone's system is different. We strongly recommend you give Biotic 365 at least four weeks to work its full magic, and some clients really start to see considerable results after eight weeks. Once you start taking Biotic 365 every day, you can expect to start seeing results within 30-60 days and sometimes sooner.

### How often do I take Biotic 365?

We recommend you take one capsule with your first meal of the day, and make this part of your morning routine. That said, this is not a requirement, and you can feel free to take it with any meal of the day or in between meals. In the event you miss a day, just continue normally the next day. Please make taking care of your gut a priority, especially during your first 60 days to ensure you're getting the proper amount put into your digestive system.

### Is it safe to order online from your web site?

Yes. 100% of your data is encrypted, safe and secure with our 256-bit secure shopping cart. This is the same encryption used by Apple and Amazon. Plus, our secure cart is verified by numerous 3rd party security verification systems, including the leader in security scanning, McAfee Secure. You have the peace of mind knowing your information is 100% safe and secure at all times.

### Can I buy Biotic 365 in stores?

Not right now. For one thing, we can maximize the power of the internet and control the process from A to Z which means cutting out the middle-man. Not only does this guarantee you the lowest price, we're able keep a close eye from the time of production to the moment it reaches your doorstep. Plus, we want to make sure you're getting the highest quality product with the customer service satisfaction that has made us the industry leader we are today.

## United Probiotics' Biotic 365

★★★★★

Biotic 365 is packed with our proprietary blend of 19 unique strains of probiotics for optimal gut health and balance. Plus, you get 200 mg of our special Prebiotic mix to help your good gut bacteria multiply and flourish. Each daily capsule provides you with 25 billion CFU's... so you can look and feel your best, from the inside out.

© UNITED PROBIOTICS
TERMS OF USE PRIVACY POLICY

**Exhibit 6B**
**39**

40357

**Are These 3 Death Foods Killing You From The Inside?**

Nucific

Bio X4 - Tablet



3 Common Foods Doctors Are Now Calling Death Foods

3horriblefoods.com

Exhibit 7B
41







5 Common Foods Surgeons Are Now Calling "Fatal Foods"

fivefatalfoods.com